## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ANTHONY CRAIG WEST,

      *Plaintiff,*

                             CASE NO. 2:21-cv-10225

*v.*

                             DISTRICT JUDGE NANCY G. EDMUNDS
ROSLYN JINDALL,                 MAGISTRATE JUDGE PATRICIA T. MORRIS
JHONG CHOI,
JANET CAMPBELL,
EMMY CHOGE,
HENRY FENRICK, and
JESAKA DAVITT-WEBSTER,

      *Defendants.*

_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 94, 97, 100)

### I.    RECOMMENDATION

For the following reasons, **I RECOMMEND** that this Court **GRANT** Defendants Webster and Jindal's motions for summary judgement (ECF Nos. 94, 97).  I also **RECOMMEND** that the Court **GRANT** Defendants Choi, Campbell, Choge, and Fenrick's motion for summary judgment (ECF No. 100) **IN PART**.

If adopted, the Court would dismiss all of West's claims except for his individual capacity claim against Henry Fenrick for monetary damages.

### II.    REPORT

#### A.    Introduction

1

Around five million people have their wisdom teeth extracted each year in the United States.  Recovery varies from person to person, but because it can often be painful, surgeons frequently prescribe narcotics and other strong pain medication to ease patients' discomfort.

Anthony West is a prisoner who developed throat cancer while incarcerated. West beat his cancer, but several intense bouts of radiation therapy left him prone to tooth decay.  So, prison officials provided West with quarterly teeth cleanings and oral examinations as a prophylactic measure.  During one of these examinations, his dentist noticed that his bottom right wisdom tooth had impacted his molar.  West eventually had both teeth surgically extracted, and his oral surgeon prescribed him oxycontin and prescription-strength Motrin.  However, prison officials never gave this medication to West.  And to make matters worse, officials also discontinued West's quarter-annual cleanings, limiting him to one cleaning per year.

West brought this § 1983 action against a group of prison officials involved in his dental care at various points.  He alleges that these officials violated the Eighth Amendment by withholding his prescribed pain medication and by discontinuing his quarter-annual cleanings.  Each official has now moved for summary judgment.

**B.      Background**

      **1.      Medical History**

2

Anthony West was diagnosed with throat cancer in April 2015 while incarcerated at a state prison in Ionia, Michigan. (ECF No. 94-2, PageID.788). After six months of radiation and chemotherapy, West's cancer went in remission. However, this intense treatment left West prone to dental cavities and infection. (ECF No. 1, PageID.94). For that reason, West's physician recommended that he receive semiannual teeth cleanings and evaluations. (*See* ECF No. 100-2, PageID.948; ECF No. 100-3, PageID.966). West forwarded this recommendation to prison officials and was later scheduled to receive teeth cleanings and examinations every three months. (ECF No. 100-3, PageID.963–83).

In February 2019, West's dentist noted that West's bottom-right wisdom tooth had impacted his molar. (*Id.* at PageID.979). Treating the impacted teeth would require surgical intervention, but because of West's history of radiation therapy, any surgery could result in irreversible bone damage. (*Id.*) So, West's dentist referred him for further evaluation at the University of Michigan Hospital. (*Id.*) Shortly before West's appointment at the University of Michigan, West's dentist noted that one of his upper-left incisors and one of his lower-left molars were decayed. (*Id.* at PageID.983). West had his offsite evaluation a week later, and oral surgeons at the University of Michigan recommended that he return for a surgical extraction of his wisdom tooth and impacted molar. (*Id.* at PageID.983). But before that procedure

3

could be conducted, West was transferred to the Gus Harrison Correctional Facility in Adrian.  (ECF No. 94-2, PageID.793).

### 2.    Medical Care Following Transfer

Upon his arrival, Nurse Practitioner Roslyn Jindal reviewed West's medical history but did not evaluate him in person.  (*Id.* at PageID.794; *see also* ECF No. 98, PageID.872–73).  About one week after West arrived at the prison, he wrote to dental staff to inform them of his quarter-annual cleanings and his upcoming procedure at the University of Michigan.  (ECF No. 1, PageID.100).  An official responded that West's next treatment was scheduled for November, but did not mention his quarter-annual cleanings or tooth extraction.  (ECF No. 1-1, PageID.101).

On September 30, West met with a dentist, Doctor Jesaka Davitt-Webster, for an oral examination.  (ECF No. 100-3, PageID.984).  After examining West's bottom-right wisdom tooth and molar, Webster wrote a formal request for West to have his Wisdom tooth surgically removed at the University of Michigan, and the Dental Director, Jong Choi, approved the request the same day.  (*Id.*; ECF No. 100-4, PageID.990–91).  Webster also observed that West had no signs of decay in his upper-left incisor, but she found, and restored, a cavity in a different incisor.  She did not acknowledge West's decayed molar in her notes.  (ECF No. 100-3, PageID.984).

West returned to Webster a month later and reiterated his desire to continue receiving quarter-annual cleanings and examinations.  (*Id.*)  However, Webster informed West that the Director Choi had reviewed West's dental records and determined that he no longer required cleanings and examinations every three months.  (ECF No. 94-2, PageID.800; ECF No. 100-3, PageID.984; *see also* ECF No. 100-6, PageID.1019–20, 1023).  In Choi's opinion, West's "records showed that his periodontal condition was stable," and his "history of head and neck cancer" did not "automatically" warrant cleanings every three months.  (ECF No. 100-6, PageID.1020, 1023).  Webster explained to West that he could only receive annual cleanings and examinations, as the MDOC's internal policies limited prisoners to one routine cleaning per year.  (ECF No. 100-3, PageID.984; *see also* ECF No. 100-5, PageID.1005).

The following month, West wrote a letter directed to the prison's health unit manager, Janet Campbell, requesting that she reinstate his quarter-annual cleanings.  (ECF No. 1, PageID.65–67).  A nurse received West's letter, and while she did not forward the letter to Campbell, she implied that Campbell "was made aware of [West's] concerns about follow up" appointments after his previous letter.  (*Id.* at PageID.68; *see also id.* at PageID.100).  As the health unit manager, Campbell was generally responsible for administrative tasks involved in coordinating "the delivery of professional health care services" in the "correctional facility."  (ECF No. 100-8,

PageID.1034, 1039).   While health unit managers act as a "liaison" between "regional dental . . . directors," they do not provide, or oversee, dental services.  (*See id.* at PageID.1034, 1037; *see also* ECF No. 100-6, PageID.1019).

### 3.    Procedure and Subsequent Care

West finally had his wisdom tooth and molar surgically extracted at the University of Michigan Hospital at 8am on November 14, 2019.  (ECF No. 100-7, PageID.1027).  The procedure was successful, and supervising corrections officer as provided with postoperative instructions, prescriptions for Oxycodone and 600 milligram Motrin, and gauze to stop West's bleeding.  (ECF No. 94-2, PageID.796; ECF No. 100-7, 1027–30).

The post-operative instructions advised West to periodically apply an icepack to his jaw for the first twenty-four hours following surgery and it advised him to bite on gauze for at least thirty minutes following his procedure.  (ECF No. 100-7, PageID.1032).  Although the instructions warned that he may need to replace the gauze after thirty minutes if the surgical site had not stopped bleeding, they explained that small amounts of blood can mix with saliva to appear as though the site is bleeding more than it actually is.  (ECF No. 100-7, PageID.1032).  Patients are not expected to bleed for more than a few hours following surgery.  (*Id.*)  The instructions also warned Plaintiff that it could take up to five days for his pain to resolve and that his jaw would be swollen for a week following the procedure.  (*Id.*)

As the numbing anesthetic wore off on the drive back to the prison, West began to feel "extreme" pain. (ECF No. 94-2, PageID.790). When West and the corrections officer arrived at the prison's intake unit, West was in "so much pain that [he] began pacing the cell floor . . . ." (*Id.*) He then asked the intake officer, who was in possession of his medical paperwork, to call for a nurse. (*Id.* at PageID.790–91, 796). Nurse Choge arrived about twenty minutes later, took Plaintiff's documents from the intake officer, and escorted West to the "main healthcare room." (*Id.* at PageID.791, 796). When they arrived, West reiterated that he was in "tremendous pain" and asked for pain medication and fresh gauze. (*Id.* at PageID.790–91). Nurse Choge did not give West any gauze, but she did provide him with an ice pack and "four packs of Tylenol" before sending him back to the housing unit. (*Id.* at PageID.791).

West did not see what Nurse Choge did with his documents. (ECF No. 94-2, PageID.796). However, Nurse Choge wrote that she placed the documents on the "provider's desk" sometime before one in the afternoon. (ECF No. 100-4, PageID.992). In a response to an interrogatory, Choge later clarified that the "provider" she referred to was Roslyn Jindal. (ECF No. 100-6, PageID.1015). Jindal denies seeing the documents, and she notes that there are other desks— belonging to different providers—that the documents may have been left on. (ECF No. 97-2, PageID.860). However, Jindal was scheduled to work until 6 pm on the

day West had his surgery—although she had the following three days off.  (*See id.*) Jindal does not state whether she returned to her desk after 1 pm on November 14. (*Id.* at 860–61).

West never received his prescriptions—a fact he kept to himself for over three days following his surgery.  (ECF No. 94-2, PageID.792).  According to West, he expected officials to take "a day or two" to fill his prescriptions based on his precious experiences collecting prescription medication. (*Id.*)  So to abate his pain while he waited for his prescriptions, West solicited pain medication from other inmates. (ECF No. 1, PageID.90).  Specifically, West received between sixteen and twenty ibuprofen pills and "a box of Aleve." (*Id.*)  West also had an ongoing prescription for thirty 325 milligram Tylenol pills that he filled at the beginning of each month. (No. 100-4, PageID.988–92; *see* ECF No. 97-3, PageID.864–65).  However, West implies that he did not have any Tylenol left over by the time he returned from his surgery.  (*See* ECF No. 94-2, PageID.791–92).

By his fourth day of recovery, West realized that officials had not filled his prescription.  West was scheduled to have his blood drawn that morning.  (*Id.* at PageID.800).  When he arrived at his appointment, West told one of the nurses, Henry Fenrick, that he was in "tremendous pain" because he did not receive his prescriptions following his oral surgery.  (*Id.*)  West's face was visibly swollen, and he asked Fenrick to give him "something" for his pain.  (*Id.*)  A second nurse in the

8

room with West and Fenrick then reached for the cabinet to remove pain medication for West, but Fenrick "stopped her from doing so." (*Id.*) Fenrick then went on his computer to verify whether West had an oral surgery but told West that he could not find any record of his tooth extraction and sent West back to the housing unit without pain medication. (*Id.*) When West returned to his housing unit, he sent a letter to dental staff requesting that his prescriptions be filled. (*Id.* at PageID.792–93; *see also* ECF No. 101, PageID.1082).

Before medical staff read that letter, West met with Webster for a follow up appointment on November 20. (ECF No. 97-3, PageID.864; ECF No. 101, PageID.1082). West "immediately" told Webster that he had gone the previous six days without pain medication or medical supplies. (ECF No. 97-3, PageID.864). Webster told West that she was "aware that [he] had the surgery" and she informed him that his post-operative documents were "missing." (*Id.*) Webster assured West that staff was attempting to locate his prescriptions, and once they did, "she would look them over and see what she can implement . . . ." (*Id.*) West asked her why she did not already give him any pain medication while she was waiting for his prescriptions, but Webster did not respond. (*Id.*) Webster eventually examined West's mouth; "irrigated" the surgical site; and gave West ten packs of regular Tylenol, ten packs of Motrin, gauze, and antibacterial mouth rinse. (*Id.*; *see also* ECF No. 100-3, PageID.985).

### 4. Postponed Teeth Cleaning

West did not receive his scheduled cleaning in November 2019. (*See* ECF No. 100-3, PageID.985–86). Then the pandemic arrived, the world shut down, and by summer 2020 West still had not received a tooth cleaning or cavity filling. So in June, West filled out a written "healthcare request" in which he reminded staff that he "was supposed" to get his cavitied molar "filled a year ago" and he requested to be placed on the "call out for fillings." (ECF No. 1-1, PageID.127). A few days later, an official responded that West was already on the waitlist for a dental filling and that he would be eligible for his yearly cleaning in August. (*Id.* at PageID.128). August came and went. In September, West again followed up with dental staff who informed him that they still were not performing nonemergency services due to the pandemic. (*Id.* at PageID.129). West followed up in November and was told that the prison was "working on a plan" to "safely" begin nonemergency dental services. (*Id.* at PageID.130). West had received neither a cleaning nor a filling by January 27, 2021. (*See id.* at PageID.39, 130; ECF No. 100-3, PageID.985–86).

### 5. Procedural History

In January 2021, West filed this action against Jindal, Choi, Campbell, Choge, Fenrick, and Davitt-Webster. (ECF No. 1). His complaint consists of two claims. First, he alleges that all six defendants violated his Eighth Amendment right to be free of cruel and unusual punishment by failing to provide pain medication during

the week following his tooth extraction.  (*Id.* at PageID.4).  Second, West alleges

that Defendants Choi, Webster, and Campbell violated the Eighth Amendment by

terminating his quarter-annual teeth cleanings.  (*Id.* at PageID.37).  Each defendant

has now moved for summary judgment.  (ECF Nos. 94, 97, 100).

### C.   Summary Judgment Standard

Summary Judgment is appropriate where the moving party "shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that would affect

"the outcome of the suit under the governing law. . . ."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  The Court's role at summary judgment is not "to

weigh the evidence and determine the truth of the matter but to determine whether

there . . . are any genuine factual issues that properly can be resolved only by a finder

of fact . . . ."  *Id.* at 249–50, 255.  Accordingly, "the evidence, all facts, and any

inferences that may be drawn from the facts" must be viewed "in the light most

favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95

F. App'x 132, 135 (6th Cir. 2004).  The nonmoving party cannot rebut a Rule 56

motion by merely alleging that a genuine factual dispute exists.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 n.3 (1986) (quoting Fed. R. Civ. P. 56(e)).  Instead, the

nonmoving party must show that there is sufficient evidence in the record for "a

reasonable finder of fact could find in its favor."  *Anderson*, 477 U.S. at 248

**D.     Analysis**

**1.     Personal Involvement**

Even if West can prove that he was deprived of his Eighth Amendment rights, several of the Defendants argue that they cannot be held liable because the record contains no evidence that they were personally involved in West's injuries.  Before the Court can reach the merits of West's Eighth Amendment claims, it must first consider this threshold issue.

While the Eighth Amendment affords West the right to be free of cruel and unusual punishment, it does not grant him a private right of action to enforce this right in a civil lawsuit against state officials.  *Williams v. Bennett*, 689 F.2d 1370, 1390 (11th Cir. 1982); *see Harris v. Louisville Jefferson Cty. Metro Gov't*, No. 3:11-CV-338-H, 2012 WL 777263, at *1 (W.D. Ky. Mar. 8, 2012) (citing *Zinermon v. Burch*, 494 U.S 113, 125 (1990)).  West's ability to enforce the Eighth Amendment's prohibition of cruel and unusual punishment comes instead from a federal statute: 42 U.S.C. § 1983.  *Harris*, 2012 WL 777263, at *1.  Section 1983 imposes liability on any state official who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights" guaranteed by the Constitution. 42 U.S.C. § 1983.

By limiting liability to officials who "subject[]" citizens to a deprivation of their federal rights, § 1983 requires an affirmative link between the plaintiff's injury

12

and the conduct of that defendant.  *Rizzo v. Goode*, 423 U.S. 362, 371–72 (1976).

To demonstrate an affirmative link, a plaintiff must make a clear showing that each

named defendant was personally involved in the activity that forms the basis of the

complaint.  *Id.* at 375; *Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995).  Put

differently, a § 1983 plaintiff must demonstrate that each defendant's conduct was

the proximate cause of his constitutional injury.  *Powers v. Hamilton Cty. Pub. Def.*,

501 F.3d 592, 608 (6th Cir. 2007).

Defendants Campbell, Choi, Webster, and Jindal all argue that the record

contains no evidence from which a reasonable factfinder could infer that they were

personally involved in one, or both, of the claims against them.

To start, West does not raise a genuine dispute as to whether Campbell was

personally involved in either of his claims.  As to West's claim regarding his post-

surgery care, the record lacks any indication that Campbell was even aware of

West's oral surgery or his prescriptions for pain medication.  Her only possible

connection to this claim is her supervisory role over medical personnel who may

have been responsible for filling West's prescription.  (*See* ECF No. 100-8).

However, government officials cannot be held liable under § 1983 based solely on

their roles as supervisors; such vicarious liability is inadequate to establish a causal

link between the defendant's conduct and the plaintiff's injury.  *Shehee v. Lutrell*,

199 F.3d 295, 300 (6th Cir. 1999).

Likewise, West fails to establish that Campbell was personally involved in the decision to discontinue his quarter-annual teeth cleanings. Although Campbell may have been aware of this change to West's treatment plan, that decision was made exclusively by Director Choi, and Campbell had no authority to reverse Choi's decision. (ECF No. 94-2, PageID.800; ECF No. 100-6, PageID.1019–20, 1023; ECF No. 100-8; *see* ECF No. 1, PageID.65–67). Indeed, Director Choi occupied a regional position in which he oversaw the dental care provided to MDOC inmates. (ECF No. 100-8, PageID.1037). Campbell, meanwhile, was a nurse who was solely responsible for overseeing logistical healthcare issues. (*Id.* at PageID.1034, 1037; *see also* ECF No. 100-6, PageID.1019). Campbell was not a dentist, and she could not enact courses of treatment for dental patients; therefore, she was not personally involved in the decision to end West's quarter-annual cleanings. *See Martin v. Kazulkina*, No. 12-cv-14286, 2017 WL 971706, at *3 (E.D. Mich. Feb. 21, 2017); *White v. Warren*, No. 07-12531, 2009 WL 276950, at *2 (E.D. Mich. Feb. 5, 2009).

Likewise, West has not presented any evidence from which a factfinder could infer that Webster was responsible for Choi's decision to end West's quarter-annual cleanings. Although Webster's relayed Choi's decision to West, that appears to have been the extent of her involvement. (ECF No. 94-2, PageID.800). Director Choi was Webster's supervisor, and she had no authority to ignore or reject his directives. (*See id.*) Webster cannot be held liable for merely conveying her supervisor's

14

decision to West—§ 1983 requires that Webster caused West's injury before she can be held liable.  *Cf. Washington v. Caldwell*, No. 11-10448, 2013 WL 1192306, at *4 (E.D. Mich. Mar. 22, 2013); *West v. Macht*, 235 F. Supp. 2d 966, 971 (E.D. Wis. 2002) ("The most that can be said of [defendant's] involvement is that she communicated the . . . policy to plaintiff . . . . This is insufficient to satisfy the requirement of direct personal involvement.").

Further, while the parties do not dispute that Director Choi decided to end West's quarter-annual cleanings, West cannot establish that Choi was responsible for his post-surgical care.  As a regional director, Choi held a supervisory position and nothing in the record suggests that he was responsible for the day-to-day care of inmates.  (*See* ECF No. 94-2, PageID.800; ECF No. 100-6, PageID.1019–20; ECF No. 100-8, PageID.1037).  His only connection to this injury is his supervisory position, but again supervisors cannot be held liable under § 1983 "simply because" they were "charged with overseeing a subordinate who violated the constitutional rights of another." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016). And while West could circumvent this requirement by establishing that Choi "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending" officials, the record contains no evidence that Choi approved of the medical staff's failure to provide West with pain medication.  *Shehee*, 199 F.3d at 300.

Finally, West also has not raised a genuine dispute regarding whether Jindal was responsible for his inadequate pain management.  West argues that Jindal did not fill his prescriptions despite receiving them the day he returned from his oral surgery.  West testified that he last saw Nurse Choge with his post-surgery documents, and although West did not see what Choge did with her documents, Choge noted that she left the documents "on the provider's desk."  (ECF No. 94-2, PageID.796; ECF No. 100-4, PageID.992).

Of course, that alone would not provide a rational factfinder with enough information to conclude that Jindal received and viewed the documents.  As Jindal explains, there are several providers, both medical and dental, who work at the prison.  (ECF No. 97-2, PageID.860).  So Choge's vague reference to the "medical provider" does little to help a factfinder ascertain whose desk she left the notes on.  But as West correctly points out, Choge later clarified, in response to an interrogatory, that Jindal was the "provider" she referred to in her note.  (ECF No. 100-6, PageID.1015).  Were a factfinder to credit this evidence, he or she could then reasonably conclude that it would be more likely than not that Choge saw the documents before she left work, as Choge left the documents on Jindal's desk by one in the afternoon while Jindal worked until six that day.[1]  (See ECF No. 97-2,

---

[1] In her reply brief, Jindal argues that she left "in the early evening" and did not return to work until the following Monday.  (ECF No. 103, PageID.1266).  However, the affidavit she cites in support of this proposition never states that she left "in the early afternoon."

PageID.860; ECF No. 100-4, PageID.992); *cf. Graham v. Court at Round Rock*, No. A-06-CA-386-LY, 2007 WL 9710002, at *8 (W.D. Tex. Nov. 9, 2007).

But unfortunately for West, he cannot rely on Choge's answer to his interrogatory to create a genuine dispute of material fact. Federal rule of Civil Procedure 56(c)(2) allows parties to "object" to the court's consideration of "material" that "cannot be presented in a form that would be admissible in evidence." The Rule does not prohibit parties from supporting or opposing summary judgment with evidence that is inadmissible in its "current form"—only if evidence "cannot" be presented in an admissible form must it be precluded from the Court's consideration. *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 430 (6th Cir. 2018) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 324).

Choge's interrogatory answer, of course, is inadmissible hearsay. And there is no "other form" in which West could present this information that would be admissible. Indeed, Choge's testimony on the subject would not be admissible either. In Choge's answer, she states that she has "no independent recollection of [West's] claims" and that she relied on West's "medical record" to answer his interrogatories. (ECF No. 102, PageID.1168). But Choge cannot testify to facts

---

(ECF No. 97-2). All it provides is that Jindal worked Monday through Thursday until 6 pm during the relevant period. (*Id.*) Jindal cannot demonstrate the absence of a genuine dispute of material fact with this unsupported assertion. *Johnson v. Donahoe*, 642 F. App'x 599, 602 (6th Cir. 2016); *see* Fed. R. Civ. P. 56(c)(1).

about which she has personal knowledge.  Fed. R. Evid. 602.  Further, there is no source besides Choge through which West can present this evidence.  Choge is the only individual who could have had personal knowledge as to where she left West's documents, and while she claims to have learned that she placed the documents on Jindal's desk by examining West's medical record, his record does not contain that information.  (ECF Nos. 98, 100-4).  Thus, Choge's statement that she left the documents on Jindal's desk appears to be nothing more than inadmissible speculation.  Accordingly, West cannot raise a genuine dispute as to whether Jindal saw his prescriptions for pain medication.

To summarize, West can only establish that Dr. Choi was personally involved in the decision to end West's quarter-annual cleanings based on the evidence currently in the record.  And as for West's claims regarding officials' failure to treat his pain following his oral surgery, neither Campbell, Choi, nor Jindal were personally involved in these events.

### 2.    Eighth Amendment

With that preliminary issue settled, the Court can turn to the merits of West's Eighth Amendment claims.  The Eighth Amendment prohibits "cruel and unusual punishment."  U.S. Const. amend. VIII.  This protection applies not only to the terms of a convicted defendants' sentence, but also to the "conditions under which" a prisoner "is confined."  *Helling v. McKinney*, 509 U.S. 25, 31 (1993).  Indeed, "when

18

the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020); *see also DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200. Thus, the state has a duty to provide for the prisoner's "basic human needs," including "food, clothing, shelter, medical care, and reasonable safety." *Deshaney*, 489 U.S. at 200.

An official violates the Eighth Amendment where he or she acts with "'deliberate indifference' to an inmate's 'serious medical needs.'" *Plair v. Holmes*, No. 1:19-cv-815, 2020 WL 8187989, at *5 (W.D. Mich. Dec. 29, 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976)). To establish that prison officials violated the Eighth Amendment by denying medical care, the inmate must show (1) that he or she was deprived of an objectively serious medical need, and (2) that the defendant knew "of and disregard[ed] an excessive risk to [his or her] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Rhinehart v. Scutt*, 894 F.3d 721, 737–38, (6th Cir. 2018).

Two medical needs are at issue in this case: West's desire for frequent teeth cleanings and his want for pain medication following his oral surgery. To prevail on either claim, West must demonstrate that the medical needs at issue is adequately

serious such that it implicates the Eighth Amendment, and that the defendants were deliberately indifferent to that need.

### a.    Serious Medical Condition

An inmate's need to establish the seriousness of his or her medical need derives from the Eighth Amendment's proscription of "cruel and unusual" punishment. *Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021). State actors do not violate the Amendment merely because they impose "uncomfortable" prison conditions. *Id.* Sometimes, determining whether an inmate has been denied constitutionally required medical care is a simple task. *See Rhinehart*, 894 F.3d at 737. If a physician has opined that a condition requires care, or if the need for care would be obvious to even a layperson, then the prisoner can prove that his or her medical need was "serious." *Id.*[2] In these situations, all an inmate need do to establish that he or she was deprived of a serious medical need is demonstrate that officials provided either cursory treatment or no treatment at all. *Rhinehart*, 894 F.3d at 737; *see also Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009).

---

[2] To be clear, the medical need at issue need not be "essential," as the Eighth Amendment does not apply only to life-threatening ailments. *Gutierrez v. Peters*, 111 F.3d 1364, 1370–71 (7th Cir. 1997). Thus, a physician or layperson may conclude that medical care is required whenever its denial would "result in" needless "pain and suffering." *Id.* (internal quotation marks omitted) (quoting *Estelle*, 429 U.S. at 103).

Other times, however, this issue is more complex. Several medical needs are not obvious to laypeople, including judges, who are ill-equipped to assess an individual's need for medical care. So to enable factfinders to determine whether the medical need is adequately serious, the plaintiff must support his or her claim with medical evidence that establishes the "detrimental effect of the delay in medical treatment." *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted); *see also Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013). Often, this requires plaintiffs to introduce "'expert medical testimony . . . showing the medical necessity for' the desired treatment." *Rhinehart*, 894 F.3d at 737–38 (quoting *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017)).

The same is true where a prisoner has received some care for an infliction but alleges that the care received was inadequate. *Phillips*, 14 F.4th at 534–35. Here too, the prisoner must support his or her claim with medical evidence and it may be necessary to provide medical expert testimony. *Id.* Cases concerning inadequate care, however, are held to a heightened standard. Because Courts are understandably hesitant to second-guess medical judgments, a prisoner who challenges the adequacy of his or her care must demonstrate that the treatment he or she received was so inadequate "as to shock the conscience or to be intolerable to fundamental fairness." *Miller v. Calhoun County*, 408 F.3d 803, 819 (6th Cir. 2005) (internal quotation marks omitted).

### i.    Teeth Cleanings

West's claim against Choi falls under this last category of cases. This is not a situation where prison officials prevented an inmate from receiving prescribed treatment. Upon West's transfer to the prison, Director Choi reviewed West's medical and dental records, and determined that West did not require cleanings more than once per year. (ECF No. 100-6, PageID.1019–20, 1023). In his professional opinion, West's "periodontal condition was stable" and his history of throat cancer, without more, did not necessitate teeth cleanings every three months. (*Id.*) So because West challenges the adequacy of Choi's decision, rather than its existence, he must demonstrate that Choi's decision was so inadequate that it shocks the conscience. *See Miller*, 408 F,3d at 819. But a lay juror—with only a superficial understanding of oncology and dentistry—is not competent to assess the propriety of Choi's decision. *See Phillips*, 14 F.4th at 536; *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 898 (6th Cir. 2004). So to create a genuine dispute of material fact, West must point to some medical evidence that would enable a layman to find that Choi's decision "was not just incompetent but grossly so." *Phillips*, 14 F.4th at 536.

West does not meet this burden. True, he points out that in 2016, his oncologist recommended that he receive semiannual teeth cleanings, and that dental staff in Ionia placed him on a quarter-annual cleaning schedule. (*See* ECF No. 100-2, PageID.948, 963–83; ECF No. 100-3, PageID.966). But how can a layperson

compare the benefits of annual cleanings to semi or quarter annual cleanings? *Cf.*

*Phillips*, 14 F.4th at 536.   Merely presenting a modest "disagreement among

doctors" does not enable a layperson to assess whether Choi's decision was "grossly

incompetent." *Rhinehart*, 894 F.3d at 737 (internal quotation marks omitted).

Likewise, the literature West attaches to his complaint regarding oral care following

radiation therapy is inadequate to allow a factfinder to determine whether Choi's

decision was grossly incompetent.  (ECF No. 1, PageID.94–95).  The document is

not specific to West and it discusses the risks associated with radiation treatment in

broad strokes.   (*Id.*)  Moreover, while the document does suggest that individuals

should receive "at least" two dental cleanings per year following radiation therapy,

it does not specify how long these cleanings should continue.  (*Id.*)  Three years out

from his last radiation treatment, West's continued need for frequent cleanings was

questionable—at least from a layperson's perspective.[3]  Accordingly, I suggest that

West has not raised a genuine dispute of material fact as to whether Choi violated

---

[3] The delay in treatment for West's cavity on his molar might constitute a deprivation of a serious medical need.  While cavities are generally innocuous medical conditions, they may become serious if treatment is delayed indefinitely or if they begin to cause significant pain.   *Harrison v Barkley*, 219 F.3d 132, 137 (2d Cir. 2000); *see also McCarthy v. Place*, 313 F. App'x 810, 814–15 (6th Cir. 2008).  But even if West's cavity was serious enough to implicate the Eighth Amendment, this deprivation cannot be attributed to Choi's adjustment of West's teeth cleaning schedule.  Choi's decision still allowed West to request a teeth cleaning once per year, and his delay in treatment appears to have been caused by the prison's response to the COVID-19 pandemic. (ECF No. 1-1, PageID.127–29; *see* ECF No. 100-5).  West presents no evidence that Choi was involved in the prison's COVID-19 response.

the Eighth Amendment by depriving West of a serious need for frequent teeth cleanings.

### ii.    Post-Surgery Pain Management

That disposes of West's claims regarding his dental cleanings.  But his remaining claims against Choge, Fenrick, and Webster regarding his post-surgery care present a closer question.

As an initial matter, several defendants argue that West challenges the adequacy, rather than the existence, of his treatment, and for that reason he must demonstrate that the care he received was "grossly incompetent" to establish that he was deprived of a serious medical need.  (ECF No. 100, PageID.937).  They note, for example, that Webster ordered a "mechanical soft diet" for West, that she eventually cleaned his extraction site, and that she gave West over-the-counter pain medication and mouth rinse six days after his surgery.  (*Id.*)  But the medical need at issue is more narrowly circumscribed than the Defendants let on.  West does not challenge the Defendants' care for his post-surgery oral hygiene, and his need for pain management was at its zenith for the first five days immediately following surgery.  (*See* ECF No. 100-7, PageID.1032).  So the issue is not whether the defendants kept his extraction site clean, or whether they provided pain medication after West's pain had nearly resolved; the issue is whether officials helped West manage his pain when it was most necessary to do so.

Had officials *intended* to pursue these treatments *in lieu* of supplying oxycontin or prescription-strength Motrin, then perhaps West's claim would challenge the adequacy of his treatment. Suppose officials had considered providing West with pain mediation, but decided against that course of treatment, either because of the risks associated with narcotics or doubts regarding West's need for pain relief. In that instance, the Court would have to assess a medical judgment. *See Phillips*, 14 F.4th at 534–35. But here, no official made a medical judgment regarding West's need for prescription-strength medication. These medications were prescribed by a physician, and prison officials simply dropped the ball when tasked with filling the prescription. (ECF No. 100-7, PageID.1029–31). Because no official treated West's pain during the five days following his surgery,[4] the only issue is whether West had a "serious" need for pain medication and whether the defendants were deliberately indifferent to that need. *See Dominguez*, 555 F.3d at 551.

But although West need not prove that the officials provided grossly incompetent care, he still provides no medical evidence to establish that he had a

---

[4] The Defendants also note that Nurse Choge gave West a few packs of Tylenol when he returned from is surgery. (ECF No. 100, PageID.937). However, this care was too cursory to constitute medical treatment for West's pain. *See Rhinehart*, 894 F.3d at 737. The pills Nurse Choge provided to West were intended only to hold him over until he could receive adequate pain management; they were not intended as a substitute for his prescriptions. (*See* ECF No. 94-2, PageID.791; 100-4, PageID.992).

serious need for pain relief.  So to prevail on this claim, West must show either (1) that a physician diagnosed his pain "as mandating treatment," or (2) that his need for pain management would be obvious to even a layperson.  *See Blackmore*, 390 F.3d at 897–98.

West raises a genuine dispute of material fact under either method.  To start, surgeons at the University of Michigan indicated that West's pain required treatment by prescribing OxyContin and Motrin.  *See id.*; (ECF No. 100-7, PageID.1029–31). To be sure, it is conceivable that a physician might prescribe medication that he or she does not believe is necessary.  However, medications, particularly narcotics like oxycontin, are typically prescribed in a deliberate manner.  So while a prison official's failure to provide an inmate with prescribed medication may not be dispositive proof that the inmate was denied treatment a physician found to be necessary, it at least raises a genuine dispute of material fact.  *Richmond v. Huq*, 885 F.3d 928, 938–39 (6th Cir. 2018); *see Cook v. Pueppke*, 421 F. Supp. 2d 1201, 1206–08 (E.D. Mo. 2006); *see Estelle*, 429 U.S. at 104–05 (explaining that prison officials act with deliberate indifference by "intentionally interfering with treatment once prescribed").  Accordingly, I suggest that the officials' failure to fill West's prescriptions for oxycontin and Motrin raises a factual question as to whether West was denied treatment for a serious medical need.

Even if physicians had not prescribed treatment, West's need for pain management would be obvious to even a layperson. An "obvious" need for immediate medical attention arises where an inmate suffers an acute injury for which delayed treatment "would detrimentally exacerbate" the condition. *Blackmore*, 390 F.3d at 897 (internal quotation marks omitted); *see also Dennison v. Hardin Cty. Det. Ctr.*, No. 3:14-cv-P378-DJH, 2016 WL 742933, at *7 (W.D. Ky. Feb. 24, 2016).

No doubt, pain is a medical condition which can be detrimentally exacerbated by delayed treatment. *See Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991). But only pain that is substantial enough to warrant immediate care implicates the Eighth Amendment. *See Blackmore*, 390 F.3d at 897, 900; *see also McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (explaining that "chronic and substantial pain" and injuries "that a reasonable . . . patient would find important and worthy of comment" can be adequately serious). The Constitution "does not mandate comfortable prisons," so a prisoner cannot bring an Eighth Amendment claim for a prison's failure to treat minor pains or discomforts. *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). As the Sixth Circuit has recognized, the "denial of medical treatment for superficial, nonserious physical conditions does not" violate the Eighth Amendment. *Blackmore*, 390 F.3d at 897 (internal quotation marks omitted). This includes the sorts of "ailments for which many people who are not in prison do not seek medical attention." *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996). Think

27

of "mild headaches," minor scrapes, and similar ailments. *Gutierrez*, 111 F.3d at 1372 (quoting *Cooper*, 97 F.3d at 916); *see also Blackmore*, 390 F.3d at 897. Only pain for which a layperson would recognize the need to seek out medical attention is serious enough to be protected by the Eighth Amendment. *Blackmore*, 390 F.3d at 897–900.

In some circumstances, oral surgery wounds may be painful enough to warrant immediate treatment. In *Cook v. Pueppke*, for example, the Eastern District of Missouri held that a layperson would find it "obvious" that a prisoner required pain medication following a tooth extraction. *Cook*, 41 F. Supp. 2d at 1206–07. Dentists closed the surgical site with sutures and prescribed 800 milligram Motrin pills to the prisoner to manage his pain. *Id.* at 1202–03. But for over a week following the surgery, prison officials refused to provide the prisoner with any pain medication. *Id.* at 1203. And at one point, the prisoner was seen "crying" from the pain. *Id.* The Court reasoned that any tooth extraction is "a serious medical event"— particularly where the extraction requires sutures and an oral surgeon or dentist prescribes pain medication. *Id.* at 1207. Accordingly, it would be obvious to a layperson that the prisoner required pain medication. *Id.*

To be sure, the *Cook* Court may have reached too broad of a conclusion by suggesting that *all* tooth extractions are serious medical events. After all, the amount of pain caused by a tooth extraction varies from person to person. But even so, a

28

layperson can determine whether the need for pain medication is obvious even without the assistance of medical evidence.  Pain is an inherently "subjective experience."  *Cooper*, 97 F.3d at 917 (Posner, J.).  Unlike nuanced medical phenomena, no advanced degree or specialized education is necessary to understand and evaluate pain.  *Id.*  And that is particularly true where pain stems from a common procedure such as a tooth extraction.  Indeed, most people have a tooth extracted at some point in their lives, and as many as five million people have their wisdom teeth extracted each year in the United States.  Medgan Thielking, *10 Million Wisdom Teeth Are Removed Each Year.  That Might Be Way Too Many*, Vox.com (Feb. 4, 2015, 10:40 AM), https://www.vox.com/2015/1/13/7539983/wisdom-teeth-necessary.

Thus, a factfinder can assess whether West's need for pain medication was obvious without the assistance of medical evidence.  As the *Cook* Court recognized, tooth extractions can cause significant pain.  41 F. Supp. 2d at 1206–07.  West's surgical extraction, performed with only local anesthesia, is no exception.  (ECF No. 100-7, PageID.1027–28).  And as for whether West actually experienced so much pain that he obviously required treatment—that is an issue for the jury.  *Cooper*, 97 F.3d at 917.  Moreover, the fact that West scrounged and bartered for over-the-counter painkillers with some success might not prevent a juror from finding that West required the prison to supply stronger medication.  (ECF No. 1, PageID.90).

29

Indeed, it is far from clear how effectively these over-the-counter pills assuaged West's pain. (*Id.*) West's oral surgeon prescribed him much stronger medication, and West maintains that he continued to experience severe pain even with the medication he gathered. (ECF No. 100-7, PageID.1029–31). The record is also equivocal as to whether West had a continuous supply of over-the-counter medication during the week following his surgery. (ECF No. 1, PageID.90). Accordingly, I suggest that a reasonable factfinder could conclude that that West's pain was serious enough to require immediate treatment.

In conclusion, I suggest that West raises a genuine dispute of material fact as to whether officials failed to treat a serious medical need for pain medication: both because a physician prescribed painkillers, and because his need for pain medication following a surgical tooth extraction could be obvious to a layperson.

### b. Deliberate Indifference

Even if a juror concludes that West did not receive treatment for a serious medical need, that alone is not enough to find that the defendants violated West's Eighth Amendment rights. To succeed on his Eighth Amendment claims, West must also establish that the Defendants acted with deliberate indifference to his need for pain management. *Phillips*, 14 F.4th at 535. To show that a defendant was deliberately indifferent, a plaintiff must prove that the defendant knew "of the facts that show the serious medical need," that he or she "personally conclude[d] that" the

30

need existed," and that the defendant then "consciously disregarded" the need.  *Id.*
The defendant need not have acted with the specific intent that the prisoner would
be harmed—it is enough to show that he or she consciously disregarded a perceived
risk.  *Burwell v. City of Lansing*, 7 F.4th 456, 465 (6th Cir. 2021).  In addition,
"'[P]rison officials who actually knew of a substantial risk to inmate health or safety
may be found free from liability if they responded reasonably to the risk, even if the
harm ultimately was not averted.'"  *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir.
2020) (quoting *Farmer*, 511 U.S. at 834).

Even construing the facts in the light most favorable to West, he cannot prove
that either Choge or Webster acted with deliberate indifference towards his serious
medical needs.  While Nurse Choge certainly knew of West's need for medical care,
she responded reasonably to that need.  *See Wilson*, 961 F.3d at 840.  When West
returned to the prison, Choge took his prescriptions and placed them on a medical
provider's desk. (ECF No. 100-4, PageID.992).  She also gave West ice and Tylenol
to hold him over while he waited for staff to fill his prescriptions.  (*Id.*)  No
reasonable juror could view this conduct as deliberately indifferent to West's
medical needs.  At best, West may be able to prove that Choge negligently misplaced

the documents, but the deliberate indifference standard "requires more than mere negligence." *Burwell*, 7 F.4th at 465 (quoting *Blackmore*, 390 F.3d at 895–96).[5]

As for Webster, West cannot point to any evidence suggesting that she knew of and "consciously disregarded" his need for pain medication. *Phillips*, 14 F.4th at 535. First, the record lacks any evidence that Webster ever saw the prescriptions and then declined to fill them. Nor is there any evidence suggesting that Webster should have known to prescribe West pain medication herself. Webster ordered West's surgery, and she almost certainly knew, as a licensed Dentist, that West would require prescription pain medication following the procedure. (ECF No. 100-3, PageID.984). However, it would have been reasonable for Webster to assume that the surgeons who performed the surgery would have prescribed any necessary pain medication.

Had Webster known that these prescriptions went missing before her meeting with West, then perhaps West could prove that she ignored his need for pain medication by refusing to write a prescription herself. But West does not point to any evidence indicating that Webster should have expected to have received these

---

[5] To the extent that West claims Choge violated his Eighth Amendment rights by neglecting to provide gauze, I suggest that she did not deprive him of a serious medical need. Indeed, West's postoperative instructions explain that he only had to provide gauze for thirty minutes up to a couple hours, and they also explain that his blood could mix with saliva to give the false impression that he was bleeding more than he actually was. (ECF No. 100-7, PageID.1032). West therefore did not face a "substantial risk" of harm from his bleeding by the time he met with Choge. *See Blackmore*, 390 F.3d at 899.

prescriptions when he returned from the surgery. And although Webster acknowledged that West's prescriptions were missing when she met with him on November 20, she did not specify whether she knew that information before the meeting. (ECF No. 97-3, PageID.864). The most West can prove is that Webster was negligent in failing to verify that he received his necessary pain medication. *Burwell*, 7 F.4th at 465.

West does, however, raise a genuine dispute of material fact as to whether Fenrick was deliberately indifferent to his serious medical needs. According to Fenrick, he did not perceive a serious medical need when he met with West four days after his surgery. (ECF No. 100, PageID.934). Fenrick explains that West did not "appear to be in any significant distress" and that his medical record did not mention West's "oral surgery at the U of M hospital or" a prescription for pain medication." (*Id.*)

But a factfinder need not accept Fenrick's version of events. West testified that his mouth was "visibly swollen" when he met with Fenrick. (ECF No. 94-2, PageID.800). That is corroborated by West's post-operative instructions which state that he should have expected his mouth to be swollen for a week after his surgery. (ECF No. 100-7, PageID.1032). West also told Fenrick that he was in "tremendous pain" from his recent oral surgery. (ECF No. 94-2, PageID.800). And while Fenrick claims that he did not see any mention of West's oral surgery in his records, West's

oral surgery is mentioned in several medical and dental records that predate his meeting with Fenrick.   (ECF No. 100-3, PageID.983–84; ECF No. 100-4, PageID.988–92).   No juror need accept Fenrick's self-serving testimony that he did not see these records.   Although it is possible that Fenrick simply overlooked them, a reasonable juror could infer that Fenrick saw, and ignored, West's records.

Thus, viewing the facts in the light most favorable to West, Fenrick: (1) heard West complain to him of severe pain from a recent oral surgery, (2) saw that West's face was notably swollen, and (3) read medical records corroborating that West did in fact have a recent oral surgery.   With this information, Fenrick certainly knew that West required pain medication.   *See Phillips*, 14 F.4th at 535.   But rather than bring this issue to the attention of a physician, or even provide West with over-the-counter medication, Fenrick ignored West's needs and sent him back to his housing unit. Accordingly, I suggest that Fenrick was deliberately indifferent to West's serious medical needs.

### 3.   Qualified Immunity

Although West has raised a triable issue of fact on his claim against Fenrick, he must clear one more hurdle to survive summary judgment.   Fenrick argues that even if he violated West's Eighth Amendment rights, he is protected from liability because he is entitled to qualified immunity.

Under the doctrine of qualified immunity, a government official can only be held liable for violating an individual's constitutional right if that right was "clearly established" at the time. *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)). "A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). There need not be a case defining a constitutional right that directly mirrors the fact pattern confronted by the defendant: "'an official can be on notice that his conduct violates established law even in novel factual situations.'" *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) (first quoting *Littlejohn v. Myers*, 684 F. App'x 563, 569 (6th Cir. 2017); and then quoting *Hope v. Pelzer*, 536 U.S. 730, 731 (2002)). At the same time, however, courts "must not 'define clearly established law at a high level of generality.'" *Tlapanco v. Elges*, 969 F.3d 638, 649 (6th Cir. 2020) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). Existing precedent must place the "constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The key inquiry is whether it is "obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009); *see also Baynes*, 799 F.3d at 612–13

(quoting *Hope*, 536 U.S. at 741) (explaining that the touchstone of the "clearly established" inquiry is "fair warning"). When a Defendant raises qualified immunity on a motion for summary judgment, the Court must construe the facts in the light most favorable to the nonmoving party—just as it would on any other Rule 56 motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The Court need not spend much time on this issue here, as any reasonably competent official would have recognized both the seriousness of West's need for medication and the unlawfulness of Fenrick's choice to ignore that need. As to the seriousness of West's medical need, the Sixth Circuit has held since 2004 that a medical need that "has been diagnosed by a physician as mandating treatment" is a serious need, and the Court has repeatedly reaffirmed the principle that officials violate the Eighth Amendment by interfering with a prescribed course of treatment. *Blackmore*, 390 F.3d 897; *see, e.g.*, *Richmond*, 885 F.3d at 938–39; *Villegas v. Metropolitan Gov't*, 709 F.3d 563, 569–70 (6th Cir. 2013). Construing the facts in the light most favorable to West, Fenrick would have known from West's complaints, appearance, and medical record that he had a prescription for pain medication.

Alternatively, West's need for pain medication should have been obvious to Fenrick. Again, the Sixth Circuit has held for almost two decades that a serious medical need can be one which even a layman would recognize the need for

36

immediate medical attention. *Blackmore*, 390 F.3d 897. And the Court has also repeatedly recognized that pain can indicate serious medical need. *Adkins v. Morgan Cty.*, 798 F. App'x 858, 864–65 (6th Cir. 2020) (collecting cases); *see also Boretti*, 930 F.2d at 1154–55. Although the Court has never issued a binding opinion discussing whether a layman can find it obvious that pain from tooth extractions may require medical attention, that conclusion flows easily from the Court's precedents and common knowledge. Any reasonable official in Fenrick's position would have easily recognized the need for immediate medical attention.

And Fenrick's disregard for a medical need that he subjectively perceived constitutes deliberate indifference. *Phillips*, 14 F.4th at 535. Binding precedent leaves no room for debate on this issue. Accordingly, I suggest that the Court should find that Fenrick is not entitled to qualified immunity and deny his motion for summary judgment.

### 4.    Sovereign Immunity and Injunctive Relief

That nearly resolves the Defendants' motions, but there are a couple loose ends to tie up. First, West's official capacity claim against Fenrick must be dismissed insofar as he requests monetary damages. The Eleventh Amendment to the United States Constitution provides that no citizen of the United States shall commence a suit against any state. U.S. Const. amend. XI.; *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). It is well established that a suit against a state officer in

his or her official capacity is a suit against the entity he or she represents. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Therefore, by Fenrick, who is a Michigan official, Plaintiff is effectively suing the State of Michigan. *Bell v. Admin. Bd. of Claims*, No. 20-cv-10193, 2020 WL 2525827, at *5 n.6 (E.D. Mich. May 18, 2020) ("Director Washington and Warden Lindsey are also MDOC employees entitled to sovereign immunity . . . ."); *Johnson v. Somero*, No. 2:08-cv-28, 2008 WL 3245457, at *2 (W.D. Mich. Aug. 6, 2008); *Turnboe v. Stegall*, No. 00-1182, 2000 WL 1679478, at *2 (6th Cir. Nov. 1, 2000) ("[T]he MDOC, as an arm of the State of Michigan, is entitled to sovereign immunity.").

Accordingly, I suggest that, under the Eleventh Amendment, this Court lacks subject matter jurisdiction over West's official capacity claim against Fenrick to the extent that he requests monetary damages. *See Ex parte Young*, 209 U.S. 123, 148 (1908) (holding that the Eleventh Amendment does not prohibit suits against states for injunctive relief to redress constitutional injuries); *Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 836 (6th Cir. 1997) ("It is well established that § 1983 does not abrogate the Eleventh Amendment and that Michigan has not consented to the filing of civil rights suits against it in federal court.").

Finally, the Court should also dismiss West's remaining claims for injunctive relief. Should he prevail in this suit, West asks the Court to enter two permanent injunctions: one prohibiting the parties from retaliating against him and one ordering

a nonparty to conduct yearly endoscopic examinations.  (ECF No. 1, PageID.52).
The problem, however, is that neither of West's causes of action concern either of
these issues.  (*Id.* at PageID.1–46; *see also* ECF No. 94-2, PageID.804).  It is
axiomatic that a Court cannot grant relief—whether injunctive or monetary—to
redress harms beyond the scope of a plaintiff's complaint.  *See Alabama v. United
States Army Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir.2005) ("[T]o obtain
a permanent injunction, a party must show . . . that he has prevailed in establishing
the violation of the right asserted in his complaint."); *see Colvin v. Caruso*, 605 F.3d
282, 299–300 (6th Cir. 2010).  Thus, I recommend that the Court dismiss these
claims for injunctive relief and allow West to pursue his claim against Fenrick only
to the extent he sues him his individual capacity for monetary damages.  (*See* ECF
No. 1, PageID.53).

### E. Conclusion

For these reasons, **I RECOMMEND** that this Court **GRANT** Defendants
Webster and Jindal's motions for summary judgement (ECF Nos. 94, 97).  I also
**RECOMMEND** that the Court **GRANT** Defendants Choi, Campbell, Choge, and
Fenrick's motion for summary judgment (ECF No. 100) **IN PART**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin
14 days after being served with a copy of the recommended disposition, a party may

serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  April 18, 2023                    <u>s/PATRICIA T. MORRIS</u>
                                         Patricia T. Morris
                                         United States Magistrate Judge